Good afternoon, everyone. This is our last case of the day, which is case number 23-10459, Andrew Warren v. Ron DeSantis. For the appellant, we have Mr. O'Neill. And for the appellee, we have Mr. Whittaker. All right. And I see, Mr. O'Neill, that you have reserved five minutes for rebuttal. Is that correct? You may begin when you're ready. May it please the court, my name is David O'Neill. I represent Andrew Warren. He was here at council table with me. Hundreds of thousands of Floridians voted to elect Andrew Warren because they agreed with the beliefs and the viewpoints that he expressed. Governor DeSantis canceled Mr. Warren and every single vote that was cast for him because Mr. Warren's viewpoints don't follow the governor's preferred orthodoxy. This governor punishes dissenting voices. It's what he does. It's what he did to Mr. Warren. It violates the First Amendment. And the proper remedy is to reinstate Mr. Warren to the job that the people elected him to do. So can I just ask you a quick question? Because you've started, understandably, by saying that the governor's canceled viewpoints. But the district court didn't see it that way, right? The district court said there are viewpoints and there is conduct. And this case is really about conduct. We don't take any issue with the district court's description of what happened leading up to the suspension and what happened at trial. Our issue with the district court is that the district court failed to recognize that what it was describing was a classic First Amendment violation. It said that the governor targeted Mr. Warren because of his status. His status as a woke prosecutor. But, of course, the only reason the governor knew that Mr. Warren was a reformed prosecutor, a woke prosecutor, was because Mr. Warren had defined himself that way through his ideas, through his speech, and through his associations. Well, I guess I want to make sure that I'm sort of following your argument. So in the blue brief, you have three arguments for why it is, where it is that the district court went wrong. The first I'll call sort of the DeSantis is stuck with what he said in his answer response. The second is the legitimacy response. And the third is what I think you're getting at here, that this, even if it was for political benefit, it's sort of so wrapped up in viewpoint discrimination that it's a quintessential First Amendment violation, right? Is that where you're headed now? That's what I'm talking about right now. But you are right, Judge Newsom. We don't even get to this third argument because the first argument renders everything the district court did in terms of fact-finding unnecessary and not, on a proper application, unhealthy. Well, so let me ask you just a quick question before we go to either buckets one or two. On bucket three, the sort of this is viewpoint discrimination, even if it is for political benefit piece. As I read the district court's order, and this is at page 57, he says that the controlling motivations for the suspension were the interest in bringing down a reform prosecutor, a prosecutor whose performance did not match the governor's law and order agenda and the political benefit that would result. So that sounds to me like the district court has made a determination that to the extent that there was an effort to score political points, it was about performance or conduct and not about viewpoint. Your Honor, we think that read in context, the district court's opinion is essentially saying that the governor was motivated by the political boost he thought he would get by taking down someone who was a reform prosecutor. And that's really what the district court meant by performance. It was someone who carried out the job based on those beliefs and those viewpoints. We don't think on this record that the district court could have found that it was based purely on conduct. After all, no witness at trial testified that the governor was motivated by a case-based disagreement with what Mr. Warren did. As the district court found, to this day, the governor has not been able to identify a single case in which Mr. Warren failed to exercise his discretion appropriately. Are you taking issue with any of the district court's findings of fact? Again, we don't take issue with the way that the district court described what happened. Our issue is with the legal conclusion that the court attached to the findings that it made. So we think it correctly described that the governor was motivated by the political benefit he thought he would get from taking down someone with Mr. Warren's viewpoints and on the basis of his speech. We don't take issue with that. So the sentence that Judge Newsom read to you, do you see that as a legal conclusion or a finding of fact? The finding that the district court made that the governor was motivated by Mr. Warren's ideas. Performance. Performance. Well, again, Judge Newsom, I think you have to look at that in context of what the district court found. If you look, for example, at page 1242 of the appendix, the district court describes what it means to be a reform prosecutor. And the way that the district court defines being a reform prosecutor is by reference to Larry Keefe's descriptions of Mr. Warren's associations and his speech. The district court describes a reform prosecutor as one who has contrasting viewpoints from a right-wing prosecutor. And we don't need to just take the district court's own word for it. The governor, in his closing argument in the district court, said that to him, a prosecutor who does not enforce the law, which is the code that they've used over and over again to describe Mr. Warren, it's interchangeable with a woke prosecutor, a soros-backed prosecutor, a leftist prosecutor. Can I just ask you, though? I thought there's this paragraph in the district court's order. I don't have the appendix page, but you'll know what I'm talking about. It's early in the order where he says sort of here's a primer on terminology, right? There are reform prosecutors. They're viewed as being left wing. There are law and order prosecutors. They're viewed as being right wing. I think all of this terminology is silly, but you understand what I mean, right? So, I mean, but that seems to me to be describing reform prosecutors not so much by reference to viewpoints, but by reference to conduct. Some are kind of soft on crime. Some are hard on crime. Well, look, as this court made clear in Walschlag or en banc, speech is speech, right? And so if you define yourself by your viewpoints on prosecution, I believe the prosecutor should act a certain way. I believe the prosecutor should act a different way. That is speech. And a policy disagreement between a right wing prosecutor and a left wing prosecutor, that's simply another way of saying contrasting viewpoints on a disputed issue. So a conduct-based finding, one based purely on conduct, would require the governor to identify specific decisions that Mr. Warren had made and indicate that and prove to a trier of fact that he was motivated by his disagreements with those decisions. He never did that and he never tried to do that. But didn't the district court essentially find that? When the district court said, you know, I've read the executive order and the things attached to it, and it seems to me that the causal motivating factors were sort of his conduct as a reform prosecutor generally, as evidenced in part, not exclusively, but in part by what I'll call the bike policy and the minor crimes policy, and then the one piece of the abortion statement that basically says, like, I won't prosecute abortion-related crimes. Actually, I think the district court specifically found that those were not the motivating reasons. Those were the pretext that the lawyers considered necessary in order to get this through what the district court described as a heavily partisan Senate. Over and over again, the district court says that the governor did not reasonably believe that those were blanket policies. He didn't even genuinely believe that they were blanket policies. What he did believe was that those would be useful pretext for the governor has good lawyers, and they weren't going to let this go out the door without something that could be labeled a blanket prosecution policy. But the district court concluded that the abortion statement fell on the conduct side of the line, didn't it? It found that it could reasonably be read that way in isolation. But the district court also found that that was not the actual motivation for the governor. Would the prosecutor actually have to act on the statement for that to be conduct, in your view, as opposed to speech? You know, I think there are a number of contextual factors that inform that decision, that inform whether a fact finder could conclude that that would motivate a decision. Wherever that line is, we are as far from it here as we can get. These were advocacy letters written by an organization. Mr. Warren was one signatory among 90. They address national issues. They were not policies of the office. They didn't address Florida law. In fact, they they concerned issues that had never once arisen under Florida law. One, because transgender care has never been illegal in Florida. And the other, because all of the witnesses with decades of law enforcement experience testified that they are not aware of a single abortion case ever to arise. Let me ask you a different question before your time runs out. What standard of review do we apply to the court's ultimate decision that the government would have taken, the governor would have taken the same action anyway? They're supporting this court under ACLU to apply de novo review to that ultimate motivation finding. When it is necessary for protection of First Amendment rights, as we think it is here, then that is a question that this court can review de novo, as if the district court never made the finding. We think that it is clear that the obvious explanation here is the right one. The governor didn't like what Mr. Warren was saying, and so he punished him for it, came up with a pretext that he thought would pass muster. And, you know, Judge Newsom, I've spent my time on bucket three. I do want to hit bucket one because I. Can I just ask Judge Pryor's indulgence to follow up briefly on the standard of review, and then at least speaking for myself, you can go on as long as you need to, because I have gobbled up a lot of your time. But can I just press you a little bit on the standard of review? Because I read ACLU, and, I mean, you'll acknowledge, right, that ACLU doesn't settle on a standard of review. In fact, it says that even if we assume, I think it said, that the clear error standard is the one that applies in retaliatory discharge cases, which would be our analogy here, we don't think it makes a difference here, right? So they don't really settle on anything. And are you aware of this case Beckwith, which I think is the closest? I mean, Beckwith says, right, issues of causation in retaliatory discharge cases present questions of fact. Isn't that, I mean, this is fundamentally a causation issue, right? I don't think it is necessarily just a causation issue. I think the question under Malhealthy is, look, the defendant has violated plaintiff's rights. He has violated the First Amendment rights of the plaintiff. Is there a reason that the plaintiff should not be back in his job? But the reason is would have done it anyway. That's causation, right? Would have or could have done it anyway, and that's where we get to our legitimacy argument. I think ACLU is best read as saying that where the ultimate motivation is the issue in the case, as I think everybody agrees it is here, and the district court made that clear over and over again, that this court can engage in a searching review of the record. We don't actually think that that is necessary here. We think that to the extent this court reads the district court's decision as truly based on conduct alone, in other words, decisions that Mr. Warren made in specific cases, that there is not sufficient evidence to find that. There are only two things that the governor has pointed to on that score. One is this packet of materials that Sheriff Chronister gave to Larry Keith, and the district court found that Mr. Keith paid no attention to those details. He didn't care what was in those. He was interested in reputation, didn't conduct an investigation. And the second is that speakers at the press conference talked about cases. Well, if we're going to judge the motivation based on what was said at the press conference, then it's overwhelming that the animus here toward woke ideas and woke viewpoints was a motivating factor. Judge Newsom, I explained that the status of being a left-wing prosecutor, the status of being a reform prosecutor in the district court's words, was inherently and inextricably intertwined with speech and ideas. Even the governor agrees with that. If you look at the closing from the district court, the district court is asking governor's counsel, the question is why he did it. The night of the announcement, he goes on national television, the question is why did he do it. First words out of his mouth are Soros prosecutors. That's the district court's question. The answer is that is accurate, but I believe that is shorthand for prosecutors who don't enforce the law. So in other words, in the governor's mind, prosecutor doesn't enforce the law. Is a Soros-backed prosecutor? Is a woke prosecutor? They are not basing it on what those prosecutors do. They're basing it on what they say and who they associate with. And that is a First Amendment violation. The one trick I've had in trying to get my head around this case is, you know, perhaps because there was a lot of discovery done and, you know, sort of testimony taken, there's this sea of facts from which it feels like both sides can kind of cherry pick what sort of suits their narrative. And I'm not suggesting that either side has done that, but there's just plenty to go around here. And so it just seems like the default move is to what the district court found instead of, like, what the evidence showed, it's what the district court found. And it seems like if you read the district court's opinion back to the standard of review question, the district court certainly thought that it was making findings of fact. You know, it said over and over, I find as a fact. I find, find, find, find, find. It thinks it's making fact findings, and I think that Beckwith suggests that these causal issues are fact findings. So why aren't we just sort of stuck with what the district court said without respect to what else is out there in the sea of sort of fact evidence? Well, first, I think you do need to look at the district court's findings in context. Sure, of course. And I think in context what they show is that they are bound up inextricably with Mr. Warren's speech and associations, and you simply cannot remove that from the governor's mind and still believe that he would have made the same decision purely on conduct, in other words, case-based disagreements. Just so I understand, at that point, at that point are you really making, I can understand why you wouldn't want to say it, but I'm going to make you say it. Are you really making an argument that the findings that the district court made were clearly erroneous? We think the district court's findings, his description of what motivated Mr. Warren and what happened in the district court that he accurately described, that we think he attached the wrong label to it. And so we think that if you read those factual findings, we don't, but if you read those factual findings as saying this really was based just on conduct, in other words, again, I'm repeating because I think it's important, disagreements with things Mr. Warren did in specific cases, decisions he made in specific cases, then yes, that would be clearly erroneous. We don't think that the district court actually found that. I do want to return to bucket one because I think it's part of the answer. The district court's factual findings, the court never should have gotten there. The question in this case was the defendant has to come forward, he has to give a clear, reasonably specific, and concrete reason for his actions. That is the way Mt. Healthy works. It is his burden to show it. He did come forward and he said, I suspended Mr. Warren for one reason and one reason only. He had made blanket refusals to prosecute certain cases, and that not constitute a neglect of duty and incompetence. The district court rejected that. It concluded it wasn't true. It wasn't true that Mr. Warren had made any blanket refusals, and it wasn't true that the governor was genuinely motivated by that rationale anyway. And the governor's counsel is now trying to sort of fudge this all under this heading of, well, we really fired him for inadequate performance. That is just not true. Well, but in the answer, in the governor's answer, for example, there were other motivations listed in there. So I'm not sure I agree that Mr. Warren had no notice of these arguments. Actually, I think if you look at the answer, the single motivation is that Mr. Warren had made express blanket refusals to enforce the law. That's what they said over and over again. And not only did they plead that one reason as their reason, they disavowed the reason that the district court adopted. And here, again, I'm reading from page 1205 of the closing. This is an exchange with the court and the governor's counsel. Court, a policy disagreement wouldn't be a basis to remove a state attorney unless there was something that did constitute neglect of duty or incompetence. Governor's counsel, right. Court, and you don't have any of that for Mr. Warren, just these four writings. Governor's counsel, just these four. So can I ask you a quick question, though, because to Judge Pryor's question, for instance, you quoted paragraph 135 of the answer. Paragraph 133 says the following. Defendant did not suspend plaintiff for any protected speech. Rather, defendant suspended plaintiff for legitimate non-retaliatory reasons based upon an announced course of conduct. Based on plaintiff's express pledge not to enforce validly enacted Florida statutes with which plaintiff disagrees, defendant concluded plaintiff would not enforce certain criminal statutes, which is a valid non-retaliatory ground for suspension. That sounds like conduct, conduct, and more conduct to me. Conduct based on one ground, which is that the governor asserted that Mr. Warren would not exercise discretion at all. There are two fundamentally different concepts here. One is a prosecutor who refuses to exercise discretion at all across a category of cases. That's one. Concept two, a prosecutor who exercises discretion across cases but reaches decisions the governor doesn't like. The answer, the proof at trial, all of the governor's arguments at trial, all of the testimony of his witnesses, they were all concept one. They were all that Mr. Warren does not exercise discretion at all, and that's neglect of duty. They disclaimed any theory that they disagreed with the decisions he made with appropriate exercise of discretion. I think we understand your argument on that. Can I ask one more question? I'm so sorry, one more, and I'm going to ask the other side of this as well because it seems like, I wonder if this fixation on the terminology of blanket non-enforcement policies is sort of causing people to lose track of what the real issue is. I mean, couldn't a blanket non-prosecution policy be either a per se, come hell or high water kind of policy, or one that applies sort of generally across a category of cases? I mean, could a presumptive non-prosecution policy of the sort that we're talking about with the bike policy or the minor crimes policy, could that barely be described as a blanket policy? I just sort of wonder if the terminology has sort of like overtaken us here. If that makes sense. I understand the question, and I think the answer, and the Governor's clear position throughout is that the problem with a presumptive, the problem with a blanket policy is that it removes discretion, individualized case-specific discretion altogether. That was the rationale, and they didn't make that up. That comes from a case called Ayala. His lawyers, the Governor's lawyers, needed something that they could call a blanket non-prosecution policy in order to claim that this was not the exercise of discretion, but the refusal to exercise discretion. And so that's what they meant by blanket. But to Judge Newsom's question, what if they didn't prosecute 90% of the cases under the presumption, and the Governor thought they should be prosecuting 50% of the cases? I mean, wouldn't that be conduct as opposed to speech? That would be the kind of policy judgment that prosecutors make all over the country all the time. That is why there are elections for state attorney. So you're saying that wouldn't be incompetence or neglect of duty? It would most definitely not be incompetence or neglect of duty. All right. Let me ask you one question before you sit down, and that is, if we were to disagree with the district court about whether any of the motivations were protected by the First Amendment, would we remand for the district court to reweigh the factors in consideration of whether the decisions would have been made anyway, or what should we do? I think you would remand with instructions for the district court to reinstate Mr. Warren and to grant him the permanent injunction that he's asked for because at that point, this court would have attached the correct legal label to what the district court found. This, again, is assuming you get past bucket one and conclude that the district court could have kept going once it rejected the one reason that the Governor offered. If you accept the factual findings that the district court made and you conclude that they were, in fact, a violation of the First Amendment, then the district court has made its decision. Well, if they all were violations of the First Amendment, what if one was and one wasn't? Is there a reweighing necessary then? The district court identified two. One was desire for political benefit, and the second one taking down a woke prosecutor. I think if you conclude that taking down a woke prosecutor is viewpoint discrimination, as we believe very much it is, then the political benefit from doing so just adds fuel to the fire. That just makes it doubly viewpoint discrimination. I just want to make sure that I've got my head around the factors because you said the district court identified two, and then they weren't the two that I thought you were going to say. My recollection of sort of the catalog of the district court's reasons was that there were six, two of which he found sort of off-limits, right? And what I'll call the balance of the abortion-related statement and the Soros stuff, right? Off-limits, that's First Amendment, get out of here. But the balance of it, like being a reformed prosecutor, generally conducting one's office as a reformed prosecutor would, C.E.G., the bike policy, the minor crimes policy, and the abortion commitment, that stuff is conduct, and that's fair game. And then there's this thing about political benefit, which admittedly the district court doesn't talk about for very long, but I understand your point to be if you're trying to score political points sort of at the expense of viewpoint, that's bad. And if you're trying to score political points at the expense of bad conduct, well, that may be okay, which gets us sort of back to the first quotation that you and I were sort of talking about at the beginning where the district court says he's trying to score political points to discharge a reformed prosecutor whose performance he doesn't agree with. Right. So let's take those first two factors first. Obviously if this court were to review on an ACLU de novo standard and conclude actually the real motivations were the ones that we've said all along they were, which were even like the speech that Mr. Warren had made in those letters, then of course that is a First Amendment violation and Mr. Warren wins. I do think you have to look at the remaining four factors and see what the district court actually said about them. So it is true he identified the bike policy, the low-level offense policy, the one sentence in the letter. But the only role that those served in the district court's findings was pretext. They twisted in the district court's eyes. Again, I'm paraphrasing the district court's finding. They twisted these policies to make them look as if they were blanket policies, blanket meaning refusal to exercise any discretion whatsoever, because it was necessary to supply a pretext in order to justify the suspension. In other words, it was not the real reason. He wasn't motivated by the low-level offense policy. He wasn't motivated by the bike policy, and he wasn't motivated by the one sentence. He didn't really care what those policies were. He wanted to take down a woke prosecutor, and that was the pretext that would allow him to do it, that would allow Mr. Keefe, who was beating down the lawyer's door, to get it past their office and get it out. Judge Pryor, can I ask just one more? This is the flea on the hair of the tail of the dog. So I'll have all my ducks in a row. I know there's a lot in this opinion you don't like. There probably is some stuff that you do like, but I just want to ask you, given Pennhurst, was the district court authorized to say over and over and over that this conduct violated the Florida Constitution? I mean, if we know, the district court acknowledges, and I think the law backs this up, that you can neither issue an injunction nor a declaratory judgment about state law, you know, vis-a-vis the 11th Amendment. But it seems to me like there are a number of effective declarations of Florida law in this opinion, and was that kosher under Pennhurst? Look, I think all the district court was doing was acknowledging the limitations of Florida law that the governor acknowledged. The governor acknowledged that the reasons for the EO have to be stated there. The governor acknowledged, as I just quoted from his closing, that policy disagreements are not a basis. So the court was not creating new findings or new law under Florida law. It was just repeating back the things that the governor had acknowledged as limitations on his authority. Now the governor has tried to change those now. But in any event, I think that there was a reason for the district court to opine on that, and that is our bucket two, which is you can't use another reason as an excuse not to reinstate someone whose rights you violated if you never would have had authority to do it anyway. If the reason that has been given is beyond your authority under state law, then that's not an excuse to avoid reinstatement. So it was relevant for purposes of the Mount Healthy analysis in any event. All right. We're going to give you back your full time for rebuttal because you answered an awful lot of questions, and we're going to hear from Mr. Whitaker now. Thank you, Your Honor, and may it please the Court. Henry Whitaker from the Florida Attorney General's Office for the Governor. This support bill boils down to whether Judge Hinkle clearly erred in accepting the governor's same-decision defense. I think what we've heard today underscores this. Mr. Warren's arguments to the contrary depend on reading the district court's opinions to have found something other than the district court did. On page 1273 of the appendix, I think is the key passage, reproduces the key passage, where the district court had this to say about the governor's motives. Quote, the unprotected factors that motivated the suspension were Mr. Warren's actual performance underscored as a prosecutor. I'm sorry. Excuse me. Actual performance, and I'm still quoting, not advocacy, as a reform prosecutor. The one sentence in the abortion statement, the bike and low-level offense policies, and the anticipated political benefit. And so I do not think it's accurate to characterize the district court as having rejected the reasons that the governor asserted. We asserted all along that the governor suspended Mr. Warren for the abortion statement, for his abortion pledge, his pledge not to prosecute abortion crimes, and because of the bike and low-level offense policies. And there is no basis to overturn that finding as clearly erroneous. Can I ask you just a quick question, just so, since we're now kind of in standard of review land, what do you have to say about, frankly, I, speaking for myself, think that the closest thing I've found in 11th Circuit law is probably Beckwith, which says that causation issues are findings of fact which are subject to clear error. But there is this line in ACLU drawing on Supreme Court precedent about constitutional facts. I've got to tell you, I frankly have no idea what those are and how you would distinguish a constitutional fact from sort of an ordinary fact. But what about that? I mean, if this is sort of where the road ends for this claim, why is it not a dispositive constitutional fact? Yeah, well, I think this court's decision in ACLU actually drew a clear distinction between those two things, between facts where there's only one motive question in a First Amendment case, that is, there's only one question of ultimate motive, and the situation in a First Amendment retaliation action where findings as to motive are intermediate steps along the way to an ultimate determination. That was the distinction the court drew, and it cited some old Fifth Circuit precedent, footnote 7 in that old Fifth Circuit case, to support the reasonableness of that distinction. Although I think you're right, Your Honor, as you said, as your question suggested in the opening, that the court did not definitively rule on that. But I do think that that—and I do think this is, admittedly, slicing the baloney kind of thin when you think about the constitutional fact doctrine. But I do think that, especially when you're talking about the same decision defense, and the district court has to weigh relative motives, not just find a motive, but parse relative motives, particularly on a large, as Your Honor mentioned, a large record such as this, that is something that is uniquely within the province of the district court and is, I think, more fact-bound than the typical situation in your ordinary constitutional fact case. So I do think that that's right, and actually, I think there's some support for that in Mt. Healthy itself, because in Mt. Healthy itself, the court was faced with district court factual findings that it thought were ambiguous about whether it made out the same decision defense, and the court didn't go on to just sort of find the facts on its own. It actually remained the matter for additional proceedings. But I do think that Mr. O'Neill and Mr. Warren tries to say, well, conduct is inseparable from ideology, but mixed motives are precisely what the same decision defense is designed to ferret out. And I do think that the terminology the district court used, it was clearly using the term reform prosecutor and conduct as a reform prosecutor in the conduct sense and not in the ideology sense. The district court could not have been more clear that it was separating out motives that were based on Mr. Warren's ideology from motives that were based on his conduct as a prosecutor. And the terminology the district court used is found at page 1226 of the appendix, where this is what the district court had to say at the outset of that. One factor in the suspension was Mr. Warren's general approach to the prosecutorial function, dash, how he did his job. That is talking about conduct, not ideology. And that's what the district court's findings say. And if I could just draw an analogy, perhaps, I mean, if you had a prison warden who was an abolitionist who started letting inmates out of jail, if that warden got fired in part because he was a prison abolitionist and in part because he was letting inmates go scot-free, I think it would be entirely permissible for a district court to accept a same-decision defense on the basis of the conduct there. And there is an analytical distinction between those two things. Or if your law clerk, let's say, Your Honors, came to you and said, I'm not going to come to work anymore. And by the way, the reason I think I'm not going to come to work anymore is because the federal judiciary is corrupt. Well, I think you could fire that law clerk on the spot. And I think if the law clerk said, well, it was all because of my ideology. I said why I was not going to come to work anymore. It was all about that, you would have a same-decision defense, I think, even though the actual statement of future intention was in some sense motivated by ideology. That is the function of the same-decision defense. And it's within the province of the district court to find that. Let me ask you this. What do you say to my sort of query, just sort of thinking out loud, about blanket non-prosecution policies and whether or not the terminology might be used differently by different people in this litigation? I have to confess, like, even the governor's executive order seems like a little internally inconsistent to me because it talks about blanket non-prosecution policies, but then it talks about the bike and minor crimes policies as presumptive and as including exceptions. And so I guess I just don't even really know what that term blanket non-prosecution policy means anymore. Yes, Your Honor, certainly. Certainly in our view, a blanket non-prosecution policy is more than a declaration that a given law will never be enforced. And I think, quite frankly, Judge Hinkle's opinion and much of Mr. Warren's arguments are dependent on reading, on saying that that is the only possible meaning of blanket non-prosecution policies. And we certainly argued ourselves before the district court that that wasn't the case. In the motion to dismiss, when we weren't sure whether the state law question was easier or not out of the case, we certainly took the view that even if there is a policy that is a categorical declaration that a certain subset of crimes won't be enforced, that certainly can be a blanket non-prosecution policy. And I think the district court concluded otherwise only by assuming that the only circumstance in which you can have a blanket non-prosecution policy is IALA, which we do not think is the case as a matter of Florida law. But I think this goes to the point about what did the district court exactly find was a pretext? And I think what the district court found was a pretext was not, as Mr. O'Neill suggested, the fact that we relied on the bike stop and abortion pledge. Instead, what he said was a pretext was the governor's legal characterization of those policies as blanket ones. It was, in essence, a legal disagreement with whether, as a matter of Florida law, those could be a basis for suspension. But he, as clear as day in the order, in the passage I read to you, and in many other passages in the district court's opinion, found that the governor was actually motivated by the things that we said he was motivated by, namely the abortion pledge and the resultant non-prosecution policies. I did want to – I mean, I think the political benefit motivation, though, is a closer case than some of the examples that you've given us because there – I mean, if you're talking about the conduct and the policies, those are other motivations that the district court separated out. But the political benefit, Mr. O'Neill says, comes from the viewpoint that the prosecutor espoused. And there's no separate conduct that's identified there as being objectionable, is there? Well, I think that what the district court was saying, Your Honor, is that there's nothing wrong with an elected governor taking action based on non-First Amendment-protected conduct simply because his constituents might approve of it. And so I don't – I do think that the district court found, and I think Judge Newsom actually put his finger on the relevant passage in the district court's opinion when he quoted the passage reproduced at page 1277 of the appendix when the district court said, in short, the controlling motivations for the suspension were the interest in bringing down a reformed prosecutor, a prosecutor whose performance – not ideology – performance did not match the governor's law and order agenda and the political benefit that would result. And I don't think that political benefit in that sense, in the sense that, well, an elected official might think that his constituents would approve of him suspending a prosecutor that the governor thought was lawless. The district court's point, I think, was that there is nothing wrong with that. And Mr. Warren complains of a lack of notice. Well, there was no lack of notice here because all of the evidence that related to Mr. Warren's conduct as a reformed prosecutor and the evidence of political benefit was evidence that Mr. Warren himself presented, indeed trumpeted, and tried to say that all of that showed that the governor suspended him because of his ideology. The district court drew a different inference from that. It said the district court's point was, okay, Mr. Warren, fine, but all of that is consistent with the idea that the governor acted based on non-First Amendment-protected activity. So you don't deny that if the governor was trying to score political points for suppressing coarse speech, we might have a problem. But you're just saying the district court found that's not what happened. He was trying to score political points by firing a prosecutor whose performance or conduct he disapproved of. Certainly political benefit that stemmed from First Amendment impermissible motives, yes, would absolutely be different, Your Honor. But that's not what the district court— But I guess I just want to make sure that we're all clear. We agree that that's what the political benefit factor of the district court's analysis boils down to, whether we think the political benefit was scored at the expense of viewpoint or scored at the expense of conduct with which he disapproved. I think the only way to read the district court, reasonable way to read the district court's opinion, is it thought that that flowed from permissible motives, Your Honor. And the district court was very careful. It laid out, as you mentioned, six factors, two impermissible ones and four permissible ones. And I think the district court was right that there is nothing wrong with an elected official taking action on the basis of non-First Amendment-protected activity because he might think his constituents would approve it. Nor is that motive meaningfully different from the motives that we did plead. We did and proved and asserted all along that the governor suspended Mr. Warren because of his presumptive non-prosecution policies and because of the abortion pledge. We didn't separately note that he did it because he thought it was the right thing to do or that he did it because that he thought his constituents might approve it. That's sort of implicit, I would have thought, in that motive. And there was abundant evidence that conduct is what was driving this decision. That finding is not clearly erroneous and not just because Mr. O'Neill wants to focus on Mr. Warren's particular prosecution decision, and there was evidence of that. And I would note, for example, that the governor's office, not just Mr. Keefe, but the governor's office, including Mr. Newman and Mr. Treadwell, had 126 packets of material from Sheriff Chronister that detailed at length a number of different non-prosecution decisions that the sheriff in Hillsborough County thought certainly were of concern. They had that before them. So there was evidence of specific decisions. But in any event, there doesn't need to be evidence with respect to specific decisions to know that Mr. Warren was suspended for his conduct. That is abundant. Well, some of the confusion in this case has been injected by your client's position in fairness because trying to walk a fine line between saying this is conduct rather than viewpoint but also still stay within the reasons that are permitted by the Florida Constitution for suspending, for terminating the officer. Isn't that right? Oh, I don't think so, Your Honor. And just to be clear, I mean, I do think that there's a distinction as a matter of Florida law between having cause for suspension. That's sort of the threshold question in the Florida law, and I think maybe Judge Hinkle didn't appreciate this either, between having cause and then, but on top of that, there is a discretionary determination that the governor made. The Florida Constitution says may suspend on the basis of various causes, including incompetence and neglect of duty. Once a governor has cause, I think he has substantial discretion to consider a variety of factors in a suspension. He's not limited to just the factors that led to a neglect of duty. That's a discretionary determination, and I don't think we introduced any ambiguity on that. And I do think that, you know, Judge Hinkle described the motivation at a somewhat higher level of generality than maybe we described it at times and relied on additional evidence. But in the end, someone who pledges not to prosecute abortion crimes and pledges presumptively not to prosecute a variety of other kinds of crimes, including prostitution, trespass at a business location, and the like, certainly can be fairly described as a reform prosecutor. That finding is amply supported. I do, if I'm happy to answer further questions, I did briefly want to discuss the arguments that particularly Mr. Warren makes in his reply brief about burden shifting. And Mr. Warren says, again, as I've been trying to illustrate, the district court didn't reject our reasons, but I think it's important to note that even if the district court had rejected the governor's reasons, that certainly wouldn't be a basis for saying that Judge Hinkle could not permissibly infer a lack of retaliation on this. And I think that's because that would determine what the record shows, not based on the particular arguments. And the Hicks case, which Mr. Warren heavily relies on in his reply brief, proves it, because in Hicks, what the Supreme Court said is in a Title VII case, even if the fact finder, in that case it was a bench trial, a district court, even if the fact finder rejects the defendant's proffered reasons, the fact finder still can permissibly find discrimination, even if, and that's not what happened here, but even if that were true, the fact finder can do that. And the only difference between Hicks and here is the burden of proof it's true it was on the governor in the same decision defense, but that only goes to what would happen in the absence of evidence, or if the evidence were inequipoise. Here we are assuming for purposes of this argument that the evidence actually supports the district court's finding, and the question is, well, is there some different principle that's applicable simply because the reasons were rejected? And I think that Hicks shows that that's not a correct statement of the law. I'm happy to answer any further questions. Obviously, we've advanced a number of alternative grounds of affirmance. We don't think the court needs to get into those. If it finds that Judge Hinkle's finding was not clearly erroneous, I'm certainly happy to answer any questions on that or anything else before I sit down. Can I ask you one more? It's the same question that I asked Mr. O'Neill, but about the Pennhurst issue. Do you read the district court's opinion as containing, in effect, a declaration, effectively a declaratory judgment with respect to Florida law? Well, I don't think the district court entered a declaratory judgment under Florida law. I do think the district court's conclusion about Florida law was somewhat gratuitous dicta that certainly the district court did not need to reach. And this is just I'm expressing my own ignorance. I feel bad about this. I teach Pennhurst. I should know Pennhurst better than I do. But so does Pennhurst really just preclude the district court from issuing certain decretal language or does it actually preclude the district court from deciding questions of state law that might thereafter give rise to certain decretal language? I just don't know. Well, Your Honor, I confess I had not specifically thought about that question. We have not contended that the district court committed legal error in issuing dicta on Florida law. Certainly this court and courts in general can issue dicta sometimes. I don't think that that dicta could be binding in any way on the state or anybody else, and I do think it was gratuitous. But we are not contending the district court erred in that regard. If there are no further questions, I'm happy to sit down. Thank you. Mr. O'Neill, rebuttal. Thank you. Just a few points. First, on the ACLU, the standard of review, our arguments do not depend on this court applying a de novo standard of review. The only way that the governor's motivation does not implicate the First Amendment is if it was based on case-specific disagreements with what Mr. Warren did and decisions that he made. Just so I understand, why does it have to be case-specific? There might be a really easy answer to this question, but I don't think I'm quite following it. If he just thought that Mr. Warren had just sort of a law and order program that he didn't agree with and he couldn't trace it to a single specific matter, but he just said, I just don't think this guy is going to do it the way I want him to do it. That might violate Florida law. I have no idea, but how does it violate the First Amendment? For one thing, that is not the rationale that they gave for the reason. It's not the one that they sought to prove, and so it would fail under bucket one of our arguments under Mt. Healthy. The second is, this is why we have elections for state attorney. The Florida people could have chosen a system in which the state attorneys have to pursue the agenda, the viewpoint, the policies that the governor did. They didn't choose that system. Instead, they chose a system in which each of the 20 districts has a prosecutor who is elected because they go to voters and they say things like, I believe in drug courts. I believe in no cash bail. I think I agree with all of that. I'm just trying to figure out how it implicates the First Amendment. It might be violative of Florida law for any number of reasons. I have no idea, but it still seems like conduct to me and not speech. Telling your voters how you're going to conduct your job is core speech. Telling them what your policies are on the kinds of issues that will come before you, what your agenda is, what your viewpoints are, those are the things. In fact, the district court even said this. Those are the issues on which elections for state attorney turn. If those are the things on which elections for state attorneys turn, then those are First Amendment protected statements. We are talking about the statements of elected officials. As you have noted, as the court noted, I think less than a year ago, the ability of elected officials to tell their constituents what they think about issues is no less than the guardian of all other rights. Paraphrasing the Supreme Court in Wilson, surely Mr. Warren had the right to speak out on issues of government policy. Policies like the ones that he enacted. Policies like the ones that the governor disagreed with. Again, there may be easy answers to these questions that I can't quite figure out on the fly, but what about Mr. Whitaker's hypotheticals about the rogue law clerk or the rogue prison administrator? He or she clearly has the right in advance to say, I am an abolitionist, but when he or she opens the doors and lets the convicts out, that becomes conduct, right? Well, I think there are two key differences, and I actually think the hypotheticals are quite good and highlight the reasons why the governor is wrong here. First of all, in Wilson, law clerks are not elected officials. So their speech is fundamentally different. They are probably subject to the patronage exception under Elrod and Grantee. Mr. Warren is an elected official. There has to be a very wide berth around what he can say. I mean, the implication of the governor's argument here is that he could simply wait, watch an election happen for state attorney. One candidate says, I'm going to be tough on criminals and put everybody in jail. The other candidate says, I believe in drug courts. I believe in reform ideas and trying diversion programs. And in the governor's mind, he can just wait until that election happens and then remove the candidate who is espousing the policies he disagrees with. That fundamentally defeats the purpose of an election. So one difference is the warden, the law clerk, are not elected officials. The second fundamental difference is the example he gave was the warden starts letting inmates go and the governor says, I need to remove this warden because he's letting all these inmates go. In this case, the governor never proved anything that Mr. Warren did that he disagreed with. He didn't cite one case. Even with the benefit of discovery and months of opportunity, he cited no decision that Mr. Warren had made that he could point to to disagree with. So let me ask you this. I take your point that sort of the inmates haven't been let go yet, right? But maybe to tweak the hypo a little bit, what if the warden said he ran on an abolitionist platform? Forget what I just said because you're right. He's not elected. So he's an abolitionist. He announces that he's an abolitionist. And then he formulates a formal policy for his prison that says, next month we're going to start letting inmates out. Absent some extraordinary showing, we're going to start letting them out. That sort of feels like where we are here given the fact that we have the bike policy and the minor crimes policy sort of on the books, written into the office, sort of hardwiring. What then for the warden? Yeah, I think that's fighting with the district court's conclusions a little bit because what the district court found, and I wanted to complete Mr. Whitaker's explanation of the factors because I think it's significant. The district court did not conclude that the governor suspended Mr. Warren because he had this bike policy, because he had a low-level offense policy, or even because it signified anything about his approach to the job. Here is what the district court said. Mr. Keith received those materials about the policies, made no effort to determine how they were implemented within the state attorney's office. He did not wish to know. This is page 1275 on the FJP statement. And the one sentence, he made no effort to determine what effect any of the statements had within the office, made no effort to determine how the office handled cases involving those subjects. The FJP statements are a way to justify a decision already in the works on other grounds, you know, continuing on these policies. They made no effort whether on any color of review these were blanket non-prosecution policies. The district court's fundamental finding was this was all pretext. Mr. Keith never even bothered to look at these policies. They went to the governor's lawyers. Governor's lawyers are not coming up with the reasons to suspend the governor. They're coming up with the reasons to justify it. They're looking for the pretext. They find these policies. They mislabel them blanket non-prosecution policies, and they believe that that's going to survive under the Florida Senate in a Florida Senate trial. But they were not fundamentally disagreeing with the policies. They were twisting the policies in order to make them something that they thought would satisfy the pretext that they needed. So at the end of the day, is your read on the district court's opinion that it's just, like, fundamentally confused? Like, it doesn't even understand what it is doing, right? Because the district court clearly thinks that it has isolated four conduct-based reasons that support the governor's decision, and it seems like you're saying, no, no, no, in fact, the district court rejected all of the reasons it purported to accept and nonetheless came to the same conclusion. So, like, what's your read on what the district court opinion even does internally to itself? The district court's decision identifies six factors, and this is at page 1273. It says the unprotected factors that motivate the suspension, and then lists them. But it was loose with what it means by motivating factors, I think. And then it says a summary of the reasoning follows. And what the district court was saying was that all of those factors played a role in the decision. The question is, what role did they play? The political motivation, the desire to be able to go out and talk about anti-wokeness, that was a motivating factor. The desire to take down someone who had these policy views, that was a motivating factor. The others played a role. The role they played was to supply the pretext. That is, I think, what the district court found. And I think the other way in which the district court just sort of mislabeled what it found is, you highlighted the sentence in which the district court says that his performance didn't match it. It says his performance didn't match the governor's law and order agenda. Okay, an agenda, a policy, a viewpoint, those are all different ways of saying the kinds of things that you go out to voters and you campaign on and you ask them to elect you on the basis of. And when the voters make a choice, they are voting for an ideology, a belief, and it was that ideology and belief that didn't align with the governor's agenda. Let me ask you another question. So is underlying your argument a presumption that only a blanket non-prosecution policy would be conduct, that would be a fireable offense? Or is there, to go back to Judge Newsom's question, is there something short of that that would suffice? Like my example of he should be prosecuting some higher percentage of these cases. Well, I think that even the governor's counsel at least did say in the district court that only a blanket policy would justify suspension under the Florida Constitution because the state attorneys and the Florida Supreme Court has been extremely clear about this. Florida state attorneys have complete discretion in which cases to bring and which cases not to bring. The only way that the governor could say that Mr. Warren was neglecting his duty and not doing his duty at all was to say he wasn't exercising his discretion at all. And that's why they had to come up with this blanket policy rationale. But I still think that's different from whether something is protected speech. It's a different question. I think the line for protected speech is going to be based on actual decisions that someone is making in the office. You know, actual prosecution decisions. Do you seek bail in a case? Do you not seek bail? Do you prosecute this case? Do you prosecute this case? Now, we're not saying that there is nothing a state attorney could say that would justify suspension. So, there may be circumstances in which an elected official could be suspended based purely on what that person says. But wherever that line is, we're very far away from it here. Because as the district court found, Mr. Warren never pledged not to exercise discretion in any particular case. And the governor didn't even believe the contrary. He didn't genuinely think that Mr. Warren wasn't going to exercise discretion. He just needed that as the pretext to get this through the Senate. I think just to follow up on Judge Pryor's question. So, I mean, frankly on its face, and the district court says this on its face, I think the abortion pledge or commitment is pretty close to what anybody would describe as a blanket non-prosecution agreement. You know, when it says we commit to, you know, refrain from prosecuting those who provide or support abortions. That sounds pretty blanket. Now, I understand that your response is yes, but then Mr. Warren went on television and said, I didn't really, I didn't mean that in all of its full flower. I'm still going to exercise discretion. And so, there's a debate. And the governor's lawyers, you say, knew that. District court, I think, says found that the district court, that the governor's lawyers knew that. But still, we land, I think, on Judge Pryor's question. That whether or not the abortion commitment is or is not a true blue blanket non-prosecution policy, we're still in conduct land and not in speech land, it seems to me. Like, you can debate until the cows come home whether or not this is a blanket non-prosecution policy or a discretionary presumptive policy or whatever, but it's still a policy of prosecution. It's still performance conduct. It's not core speech. What the district court, I think, found is that the FJP statement as a whole is speech. It was a statement of Mr. Warren's political viewpoints. But he says, right, that this one sentence stands on a different footing. He says it stands on a different footing in that standing alone and without context, one could read that as making that kind of pledge. But he then goes on to say that any minimally competent investigation would have shown that it was not that, that it was not a blanket prosecution policy. Right. So then, I think, again, to Judge Pryor's question is fine. Like, even if we agree with you that it wasn't sort of an airtight per se blanket non-prosecution policy, was it nonetheless, how does that make it speech? I mean, I think we're just still in, now we're just in like presumptive non-prosecution land or something. That's still conduct. I understand the point. Yeah. I think the easiest answer to that is the district court found that it wasn't even actually the motivating factor. So whether it's conduct, whether it's speech, that one sentence standing alone, it was not the true motivation for the governor's decision. So ultimately, you know, whether it was conduct or speech, the district court concluded was ultimately not material. Any other questions? Thank you. Court will be adjourned until 9 a.m. tomorrow morning. All rise.